**Clifford Holt BOGGESS, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 69990.**

Court of Criminal Appeals of Texas, En Banc.

Feb. 1, 1989.

Rehearing Denied March 8, 1989.

---

**658**

Robert G. Estrada, Wichita Falls, for appellant.

Jack A. McGaughey, Dist. Atty., Montague, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Justice.

Appeal is taken from a conviction for capital murder. V.T.C.A.Penal Code, § 19.-03(a)(2). The murder was committed in Montague County and tried on a change of venue in Clay County. Appellant was convicted of intentionally causing the death of Frank Collier by cutting and stabbing him with a knife while in the course of committing and attempting to commit the offense of robbery. After finding appellant guilty of the offense of capital murder, the jury returned affirmative findings to the special issues under Article 37.071, V.A.C.C.P. Punishment was assessed at death.

Appellant raises seven points of error. He challenges: the sufficiency of the evidence to sustain a guilty verdict; the sufficiency of the evidence to support an affirmative finding to special punishment issue number two; the constitutionality of the Texas death penalty scheme; the trial judge's refusal to find that a prior reduction of a capital murder charge to murder constituted an implicit finding of fact concerning future dangerousness, thus collaterally estopping the State from seeking the death penalty; the imposition of the death penalty on one already sentenced to life imprisonment as violative of the Eighth Amendment; and the denial of due process where a plea agreement between the State and the appellant was allegedly breached.

In his seventh point of error, appellant contends the evidence is insufficient to sustain his conviction. We will set out the relevant facts upon which the jury could have based their conviction.

Appellant's conviction was based wholly on circumstantial evidence. Appellant was employed by Williams Construction Company at the time of this offense. Two employees of Williams Construction testified that in May of 1986, appellant talked about an old man in Saint Jo who carried a lot of money and would be easy to rob. Tommy Stinson, appellant's roommate, testified that appellant told him about an old man in Saint Jo who owned a grocery store. The old man did not believe in banks and always carried a lot of cash in his pockets. Appellant also told Stinson that he knew the routine of the old man and the way he closed the store. During the later part of June or the first week in July of 1986, appellant asked Stinson if he would assist him in robbing the old man. Appellant also asked for help in obtaining a weapon. Stinson refused, stating that he did not want to get involved.

Deborah Pavlak, Stinson's girlfriend, testified that she overheard a conversation between Stinson and appellant in which appellant described an old man in Saint Jo with a lot of money who would be easy to rob. Appellant stated that he was broke and "did not want to be." Pavlak overheard appellant ask Stinson for a ride to Saint Jo, but Stinson refused to take him.

Damon Smith, appellant's cousin, testified that prior to the commission of this offense, appellant told him that he was thinking about robbing and killing Frank Collier. Frank Collier, the deceased, owned a small store in Saint Jo. Appellant asked Smith to assist him in the robbery but Smith refused to help.

Mr. Grover Clevenger testified that on July 23rd, 1986, as he was passing through Gainesville on his way to Muenster, he saw appellant walking along the highway and offered him a ride. Appellant accepted, and the two men (appellant and Clevenger) proceeded on to Muenster, stopping once for a few beers. Clevenger bought the

beers because appellant said he was broke. Once in Muenster, appellant stated that his destination was just beyond Muenster, in Saint Jo. Clevenger agreed to drive appellant to Saint Jo. Clevenger dropped appellant off in Boggess Park in Saint Jo, estimating the time of day to be about noon, or a little thereafter.[1]

Clevenger remained in the park for approximately 15 to 20 minutes and upon leaving town, he saw appellant flagging him down. Clevenger agreed to give appellant a ride back to Gainesville. Appellant told Clevenger that he had just picked up a check and offered to pay Clevenger $20 for gas. Clevenger told appellant that he had plenty of gas. Appellant then offered to buy Clevenger's car for $500.00, which Clevenger refused.[2] Upon returning to Gainesville, appellant and Clevenger went to the VFW Hall to drink beer and shoot pool. Appellant paid for all the beer they consumed.

Gary Brewer testified that at approximately 6:00 p.m., on the date of the offense, he saw appellant in Saint Jo near the "mud barn"[3] which was two blocks from Collier's store. Cathy Brewer testified that she was with her husband, Gary Brewer, when they saw appellant and she recalled the time to be about 6:30 p.m. Tanya Reeves testified that she also saw the appellant near the "mud barn" between 6:00 o'clock and 6:45 p.m.

Several witnesses testified that they had been in Frank Collier's store during the evening of July 23, 1986. David Heller testified that he had been in the store on this date between 6:10 and 6:15 p.m. and Frank Collier had cashed a $20.00 check for him. Between 6:50 and 7:00 p.m. Heller was in Boggess Park when he observed a car pull up and the appellant get out. The appellant proceeded into the park where he put a substance on his fingers from a small plastic bottle with a red cap. Appellant left the park and headed towards the center of town.

Christine Brewer testified that she was in Frank Collier's store at 7:00 p.m. on the evening of the offense. She made a purchase totaling $4.00 which corresponded to the last entry in the store's register. While in the store, she saw a man whom she identified as the appellant. Upon completing her purchase, she left the store, and the man remained in the store.

Chris Milton testified that on July 23, 1986, he and his cousin went to Collier's store a little after 7:00 p.m. When Collier could not be found in the main part of the store, Milton went back to the storage area where he found Collier lying in a puddle of blood. Milton went to a nearby store and called the police.

Ray Clevenger, an officer with the Saint Jo Police Department, received a call at 7:31 p.m. that there was a problem at Collier's grocery store. Upon arriving at the store he found Collier's body in the storage room.

The Medical Examiner testified that he performed an autopsy on the body of the deceased. The deceased's throat had been cut and there were various injuries to his face, one of which appeared to be the imprint of the sole of a tennis shoe. Additionally, the nose was fractured indicating a blunt force impacting the nose and causing a fracturing of the thin bones underneath the nose. The deceased had also suffered several rib fractures as well as a fracture of the sternum. The Medical Examiner concluded that the cause of death was the wound to the neck, a stab wound to the face, and blunt force injuries to the head and chest.

An investigating officer testified that one of Collier's pockets was pulled out of his pants and the inside of the pocket was bloody. There was $950.00 in cash found in his back pants pocket. No physical evidence found at the scene linked appellant to the crime.

**1.** Clevenger testified that it could have been as late in the day as 2:00 or 3:00 o'clock.

**2.** Clevenger testified that appellant counted out $500.00 in cash.

**3.** The "mud barn" is the common name for the Western Bentonite Mud Company, a storage facility for drilling mud sacks.

Robert Williams, appellant's employer, testified that the appellant had not worked for him since the 23rd of July. Williams saw appellant on the 25th of July in an unfamiliar automobile. Appellant told his boss that he had quit drinking and saved his money in order to buy the car. An automobile salesman testified that appellant purchased an automobile from him on July 24, 1986, with a $400 cash down payment.

Appellant told at least three people that he had been involved in the murder. Phoebe Boaz, appellant's girlfriend, testified that appellant told her he killed an old man he knew in Saint Jo who owned a grocery store. He then proceeded to describe the killing by stating that prior to going into the store he put superglue on his fingers. Once inside the store he grabbed the old man from behind the counter and drug him into a back room where he cut his throat. After cutting his throat, he kicked him several times in the ribs and the face.

Kevin Moon testified that he and appellant shared the same jail cell in the Grayson County Jail. Appellant told Moon about the murder, stating that he left Whitesboro[4] on foot, about 5:30 p.m. Clevenger, who was intoxicated, gave him a ride to Saint Jo. After arriving in Saint Jo, Clevenger let him out about eight blocks from the location of the murder.

Appellant related to Moon that he [appellant] went to the store, pulled a knife and told Collier, "Okay, Frank, this is it." Appellant then went around behind the counter and grabbed Collier around the neck and threw him to the floor. He then punched Collier in the face in an attempt to shatter his nose and drive it into his brain, causing his death. When that proved unsuccessful, appellant told Moon that he began to pound Collier in the chest in an attempt to break his sternum and cause his heart to stop beating. After this also proved unsuccessful, appellant cut the old

man's throat. Appellant told Moon that he took $560.00 from Collier. Appellant then left the store and ran into the same man [Clevenger] who had given him a ride to town. Clevenger gave him a ride back to Whitesboro, stopping enroute for beer. Appellant described Collier as an old man whom he had known all of his life.

On August 5, 1986, appellant told his cousin, Damon Smith, about how he killed and robbed Frank Collier. Smith testified that appellant told him that a man from Oklahoma [Clevenger] had given him a ride to Saint Jo. Appellant was dropped off in Boggess Park where he applied superglue to his fingertips. He then proceeded to Collier's grocery store. Upon entering the store, he got a Pepsi, browsed around the store and after determining that no one was coming, grabbed Collier and threw him to the floor. He then hit Collier in the nose with the palm of his hand and drug him to a back storeroom and cut his throat. He took money out of Collier's pocket and from a wooden box used as a cash register. Appellant told Smith that after leaving the store, he went back to Boggess Park and saw the man from Oklahoma [Clevenger] who had given him a ride earlier. Appellant flagged the man [Clevenger] down and they went to Muenster where they played pool and drank beer. The appellant explained that he had to kill Collier because he knew him.

In challenging the sufficiency of the evidence, appellant contends that there were at least three other individuals who had previously discussed robbing Collier because of the large sums of cash he carried. This Court will determine, after reviewing the evidence in the light most favorable to the jury's verdict, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Mar-*

---

**4.** There is a conflict between the versions told by Clevenger and Moon. Clevenger testified that he picked up appellant in Gainesville, while Moon testified that appellant told him he was given a ride in Whitesboro. This discrepancy is not relevant to the issue at hand since the essence of both witnesses' testimony was that Clevenger picked appellant up and gave him a ride to Saint Jo.

*ras v. State,* 741 S.W.2d 395, 400 (Tex.Cr. App.1987).

█ Traditionally, this Court has applied the outstanding reasonable hypothesis test when judging the sufficiency of evidence in "circumstantial evidence" cases. This Court has held that the reasonable hypothesis analysis is not a separate standard of review, but is merely a different formulation of the normal standard of review set out in *Jackson v. Virginia,* supra; *Carlsen v. State,* 654 S.W.2d 444, 450 (Tex.Cr.App. 1983). In other words, if the evidence supports a reasonable inference other than appellant's guilt, a finding of guilt beyond a reasonable doubt is not rational. *Carlsen,* supra at 449.

█ It is not required that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved. *Carlsen,* supra at 447.

█ The evidence in the instant case reveals that appellant discussed his plans to rob and murder Collier on several occasions prior to the date of the offense. Appellant solicited the aid of others in procuring a weapon and transportation to the crime scene. Appellant was seen in the vicinity of Collier's store shortly before the offense occurred. Appellant's statement, to his cousin, that he applied superglue to his fingertips, is consistent with a witness's observations of appellant's activities in the park. Appellant was identified as being present in Collier's store shortly before the murder. Appellant's statements to others regarding how he caused Collier's death is consistent with the injuries inflicted on the body. We therefore conclude that the hypothesis of appellant's guilt is reasonable and consistent with the facts proved.

█ Appellant also argues that because $950.00 was found on Collier's body the evidence is insufficient to show that a robbery occurred. The fact that there was money left after the murder/robbery is of little consequence in light of appellant's admissions to Moon and Smith that he took money off the body of Collier. Appellant told Smith that he also took money out of the wooden box that Collier used as a cash register. The wooden box, discovered at the scene, contained only small change, food stamps and checks, but no cash. The evidence also shows that on the trip to Saint Jo appellant was without money and unable to purchase beer. However, on the return trip, appellant not only had money to purchase all of the beer consumed, but offered to buy Grover Clevenger's car for $500.00 cash, showing him the money.

The evidence is sufficient to show that appellant committed the murder during the course of a robbery as alleged in the indictment. See V.T.C.A. Penal Code, § 19.-03(a)(2). Appellant's point of error number seven is overruled.

█ In appellant's sixth point of error he contends that the evidence is insufficient to support the jury's affirmative finding to special punishment issue number two. Article 37.071(b)(2) V.A.C.C.P.[5] Appellant argues that the evidence only demonstrated a single instance of past violence; no violence was initially intended and there were no evidentiary predictions of future violence.

In determining the merit of appellant's contention, we use the same standard of review set forth in our disposition of the preceding point of error: whether the evidence, when viewed in the light most favorable to the verdict, would lead any rational trier of fact to make the finding beyond a reasonable doubt. See *Burns v. State,* 761 S.W.2d 353 (Tex.Cr.App.1988); *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Cr.App.1987) and cases cited therein.

The jury is permitted to consider many factors when determining whether the defendant will pose a continuing threat to society. Those factors include, but are not limited to:

1. the circumstances of the capital offense, including the defendant's state of

---

**5.** Article 37.071(b)(2): Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

mind and whether he was working alone or with other parties;

2. the calculated nature of the defendant's acts;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record, and the severity of the prior crimes;

5. the defendant's age and personal circumstances at the time of the offense;

6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7. psychiatric evidence; and

8. character evidence.

*Keeton,* supra at 61; see also cases cited therein.

▆▆▆▆ At the penalty stage of trial, the jury may consider all of the evidence adduced at the guilt stage. *Santana v. State,* 714 S.W.2d 1, 8 (Tex.Cr.App.1986). The calculated nature of defendant's act and the forethought with which he coldly planned and executed his crime is probative of his propensity to commit future acts of violence. *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr.App.1979). The circumstances of the offense itself, if severe enough, can be sufficient to sustain an affirmative finding to the second special issue. *Burdine v. State,* 719 S.W.2d 309, 315 (Tex.Cr.App. 1986), cert. denied 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779; *Moreno v. State,* 721 S.W.2d 295, 302 (Tex.Cr.App.1986).

▆▆▆▆ Evidence that a defendant planned a crime in advance and made preparations is proper evidence in support of an affirmative answer to the second special issue. *Livingston v. State,* 739 S.W.2d 311, 340 (Tex.Cr.App.1987), cert. denied, June 20, 1988, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895. Prior to the commission of this offense, appellant told several witnesses that there was an old man in Saint Jo who owned a grocery store and would be easy to rob. He requested, but was refused, assistance in committing the robbery. Appellant informed at least one witness that he was also planning to murder Collier since Collier knew him and would be able to identify him. To further preclude

identification, appellant applied superglue to his fingertips before entering Collier's store.

Appellant's actions upon initiating the robbery demonstrate a clear intent to cause serious injury in effectuating the robbery. Appellant told Collier "This is it, Frank", grabbed him by the throat and threw him to the ground, whereby he began a brutal assault on the victim which culminated in the cutting of his throat. This evidence suggests a calculated premeditation in the crime's execution.

▆▆▆▆ Additionally, a defendant's prior criminal record is relevant to future dangerousness. *Keeton,* supra at 61; *Brasfield v. State,* 600 S.W.2d 288, 293 n. 3 (Tex.Cr.App.1980) (overruled on other grounds). Appellant had previously been convicted of murder and received a life sentence on January 16, 1987. The State introduced copies of the indictment, stipulations of evidence, and the judgment and sentence of this prior offense. The record shows that appellant was originally indicted for capital murder but, pursuant to a plea agreement, plead guilty to the lesser offense of murder. This murder occurred on August 17, 1986, less than a month after the murder in the instant case. This evidence, in and of itself, demonstrates a propensity to commit acts of violence.

The State offered evidence showing that, while in jail awaiting trial, appellant sent letters to his girlfriend, Phoebe Boaz, threatening to kill her if she told authorities of his involvement in the two murders. Boaz testified that she was afraid of the appellant and on at least one occasion appellant had held her down by her throat and threatened to kill her if she went to the authorities. A letter was introduced into evidence at the guilt phase, in which appellant informed his cousin, Damon Smith, that if he got the death penalty he was "heading right for the judge's throat after sentencing."

Although appellant argues that the State proved only one instance of past violence, that being the conviction for murder, appellant's threats to others while awaiting trial

on a charge of capital murder are probative of future dangerousness. The evidence is clearly sufficient to support the inference that appellant's violent tendencies were not diminished nor deterred by his arrest and capital prosecution. See *Livingston,* supra at 340.

In sum, the evidence as reflected by appellant's subsequent violent criminal conduct, the severity of the circumstances of the present offense and his post-arrest criminal conduct is sufficient to support the jury's affirmative finding that there is a probability that appellant would constitute a continuing threat to society. Appellant's sixth point of error is overruled.

 In point of error number three, appellant complains that the Texas death penalty scheme is unconstitutional for failure to require mitigating instructions at the punishment phase. The trial court charged the jury on the issue of mitigation as follows: "you may consider all facts and circumstances admitted into evidence before you in extenuation and mitigation of the conduct and/or probable future conduct of the defendant." Appellant contends that the instruction given was no more than an abstract statement of the law, and submission of the instruction offered the jury as much guidance as if no instruction had been given.

It is well settled that a defendant has a right to consideration of mitigating circumstances by the jury in deciding whether or not to impose the death penalty. *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Quinones v. State,* 592 S.W.2d 933, 947 (Tex.Cr.App.1980). In order to meet constitutional muster, the jury, in a capital case, *must* be allowed to consider all relevant mitigating evidence. *Lockett v. Ohio,* supra; *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (emphasis supplied). Appellant was entitled to present evidence of any mitigating circumstances and did present such evidence, including an assortment of witnesses who testified as to his personal and family background.

The United States Supreme Court recently concluded in *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) that the trial court's refusal to give petitioner's requested special instructions did not violate his Eighth Amendment right to present mitigating evidence. Neither the instructions actually given nor the special issues submitted precluded jury consideration of any relevant mitigating circumstances, nor otherwise unconstitutionally limited the jury's discretion. The Supreme Court refused to require special instructions even when the mitigating evidence alone would warrant a negative answer to one of the special issues.

This Court has steadfastly held that even when raised by the evidence and requested by appellant, there is no right to an instruction that informs the jury that they could consider mitigating circumstances in answering the special issues. *Perillo v. State,* 758 S.W.2d 567 (Tex.Cr.App.1988); *Quinones v. State,* supra at 947. We find, in view of *Franklin* and *Perillo,* supra, that appellant's challenge to the Texas death penalty scheme is without merit. Point of error number three is overruled.

 In points of error numbers one and two, appellant argues the collateral estoppel concept as derived from the Fifth Amendment's double jeopardy clause and the Texas Constitution's protections against double jeopardy, along with Art. 27.05 V.A.C.C.P. barred the State from seeking the death penalty in this case.

The following statement of facts is taken from appellant's brief:

On September 14, 1986, Grayson County Grand Jury returned a capital murder indictment, charging appellant with the murder of Roy Vance Hazelwood during the course of a robbery. This crime was alleged to have been committed on August 17, 1986.

On January 16, 1987, the State moved to reduce the offense of capital murder to murder—intentionally and knowingly committed. The judge granted the motion. Appellant pleaded guilty and received a life sentence, with an affirma-

tive finding of the use of a deadly weapon during the commission of the offense.

\* \* \* \* \* \*

[On] February 9, 1987, a Montague County Grand Jury returned a capital murder indictment, charging appellant with the murder of Frank Collier during the course of a robbery. This crime was alleged to have been committed on the 23rd day of July, 1986.

Appellant argues that when the court in Grayson County accepted his plea of guilty to the reduced charge of murder, appellant was acquitted of the capital murder portion of the indictment, and a final and valid judgment was entered. Appellant contends that the determination had been made, in the Grayson County case, that he was not a continuing threat to society, and he therefore argues that the State should be collaterally estopped from seeking the death penalty, in the present case. We fail to see how double jeopardy or collateral estoppel, in the Grayson County case, have any relevance to the capital murder of Frank Collier in Montague County. The guilty plea to a murder charge in Grayson County for the murder of Roy Hazelwood on August 17, 1986, neither collaterally estops nor binds the State by double jeopardy from prosecuting appellant for the capital murder of Frank Collier on July 23, 1986, in Montague County. See *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *Padgett v. State,* 717 S.W.2d 55 (Tex.Cr.App.1986). We overrule point of error numbers one and two and find in doing so that neither the State nor Federal Constitutions are offended.

■ In point of error number four, appellant argues that the imposition of the death penalty on one already sentenced to life imprisonment is violative of the Eighth Amendment to the United States Constitution or the Texas Constitution.[6] Appellant relies on *Sumner v. Shuman,* 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987) as authority for his argument. The United States Supreme Court held in *Sumner v. Shuman,* supra that a prisoner already sentenced to life imprisonment could not *automatically* be given the death penalty for the commission of a separate and distinct second murder.

The defendant in *Sumner,* was convicted under a Nevada statute that mandated the death penalty for murder committed by a person who was under sentence of life imprisonment without possibility of parole for another and separate murder. The Supreme Court held that under the individualized capital-sentencing doctrine, it is constitutionally required that the sentencing authority consider, as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the particular offense. *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* supra. The Court reasoned that the Eighth and Fourteenth Amendments require that the sentencing authority be permitted to consider any relevant mitigating evidence before imposing a death sentence. *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

In the instant case, the appellant was convicted of capital murder and sentenced to death under the authoirty of Art. 37.071, V.A.C.C.P. Under this statute, the imposition of the death penalty is not mandatory, but rather the jury is required to make an individualized determination and consider any relevant mitigating evidence. See *Gregg v. Georgia,* supra. We note that appellant was allowed to present all of the desired mitigating evidence at the punishment phase. Therefore, we see very little semblance between *Sumner* and the instant case, except that the appellant in instant case also committed two separate murders.

Appellant further argues that "the purposes conceivably served by the death penalty, deterrence and retribution, are not furthered by imposing the death penalty to

---

**6.** In his brief, appellant presented his argument and authorities based solely on the United States Constitution. We will not address his state constitutional claim because of the multi-farious nature of this point of error. See *McCambridge v. State,* 712 S.W.2d 499, 502 n. 9 (Tex.Cr.App.1986).

one already sentenced to life imprisonment.... The death penalty imposed on a Defendant who was already serving a life sentence is an excessive and unnecessary punishment violating the Eighth Amendment to the United States Constitution." Appellant's argument overlooks the potential threat to guards and other prisoners that the jury conceivably considered in answering the special issues in the affirmative. In light of the foregoing, and in light of the fact appellant cited no authority for this proposition whatsoever, appellant's point of error number four is overruled.

 In point of error number five, appellant contends that he was denied due process where an agreement between appellant and the state prosecutor in one county was breached by the state prosecutor in another county.

Appellant was charged with the capital murder of Roy Vance Hazelwood in Grayson County. A plea agreement was reached between appellant and the Grayson County District Attorney whereby appellant agreed to plead guilty to the reduced charge of murder. The trial court accepted appellant's plea of guilty and sentenced appellant to life imprisonment and further entered an affirmative finding that a deadly weapon was used during the commission of the offense. After appellant was convicted in Grayson County he was charged by indictment in Montague County with the instant capital murder. Appellant now complains on appeal that the State violated the plea agreement in the Grayson County case by seeking the death penalty in the present case.

We find that the statement of facts does not support appellant's contention that the State agreed in the Grayson County plea agreement that appellant would not be subject to the death penalty for the Montague County capital murder. Appellant's reliance on *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) is misplaced. In *Santobello*, the defendant plead guilty after a state prosecutor promised not to make a sentencing recommendation. At sentencing, another prosecutor recommended that the maximum sentence

be imposed. The trial court, in assessing punishment, stated that the prosecutor's recommendation had no effect on the sentence he imposed. The Supreme Court, in reversing the conviction, held that the State was bound by the prosecutor's promise regardless of whether the prosecutor's breach was inadvertent or played no part in the trial judge's sentencing decision. Id. at 262–63, 92 S.Ct. at 498. The agreement was enforceable in regards to that offense. The Supreme Court did not restrict the prosecution from making a sentence recommendation in any subsequent case in which the defendant was involved, only in the current prosecution.

 The evidence in the instant case does not demonstrate that the plea agreement was breached. Rather the evidence indicates that the State kept its bargain by not seeking the death penalty for the murder-robbery of Roy Vance Hazelwood. The agreement was that the State would reduce the offense to murder, in exchange for appellant's plea of guilty. This the State did. Certainly it was not the intent of the State that the appellant never be prosecuted for capital murder, but rather that he not be prosecuted for capital murder in the Hazelwood case.

This Court has held that the terms of the plea agreements are contractual in nature and as a result are left to the parties to determine and agree upon. *Ex parte Williams*, 637 S.W.2d 943 (Tex.Cr.App. 1982), cert. denied 462 U.S. 1108, 103 S.Ct. 2458, 77 L.Ed.2d 1336 (1983). When a trial court accepts a plea agreement, its terms then become binding upon the parties. A party to an agreement has no contractual rights to demand specific performance over terms not appearing in the agreement or record. *Ex parte Williams*, 758 S.W.2d 785 (Tex.Cr.App.1988). Therefore, this Court will not read into the terms of the plea agreement details not contemplated by the parties as reflected in the agreement or raised by the evidence. From a reading of the record, there is no connection between the bargain struck between appellant and the State in the Grayson County murder and the prosecution in the instant case for

the capital murder of Frank Collier. Appellant's point of error number five is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., concurs in result.

DUNCAN, J., not participating.